**Gantt v. State, No. 902 of the 2018 Term, Opinion by Moylan, J.**

**POST-CONVICTION HEARING – UNAPPEALED <u>BATSON</u> CHALLENGE – INEFFECTIVE ASSISTANCE OF COUNSEL – THE SCOURGE OF LEXINGTON PARK – THE ADJUDICATORY SAGA – <u>STRICKLAND V. WASHINGTON</u>: THE TWO-PRONGED TEST – THE PERFORMANCE PRONG – THE PREJUDICE PRONG – ADEQUACY OF APPELLATE COUNSEL – THE SELECTION OF APPELLATE ISSUES – SELECTION OF ISSUES IN THIS CASE – A. MULTIPLE SENTENCES OF LIFE WITHOUT PAROLE – B. MARYLAND RULE 4–215 AND SELF-REPRESENTATION – C. THE RIGHT TO TESTIFY VERSUS THE RIGHT NOT TO TESTIFY – D. SUBPOENAS FOR WITNESSES AND A REQUEST FOR A CONTINUANCE – E. TEN PEREMPTORY CHALLENGES AND LIFE IMPRISONMENT WITHOUT PAROLE – F. THE BOTTOM LINE – THE <u>BATSON</u> CHALLENGE: INHERENT PROCEDURAL WEAKNESSES – A. NON-PRESERVATION – B. WAIVER – C. THE COMBINED PROCEDURAL FLAWS – THE <u>BATSON</u> MERITS: THE <u>PURKETT V. ELEM</u> THREE-STEP – A. STEP ONE: AN EXPRESS OBJECTION, LOUD AND CLEAR – B. STEP TWO: HE LOVED NOT CAESAR LESS, BUT ONLY ROME MORE – C. STEP THREE: ALL QUIET ON THE <u>BATSON</u> FRONT – INEFFECTIVENESS CUBED**

Circuit Court for St. Mary's County
Case No. 18-K-07-000578

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 902

September Term, 2018

_____

ANTONIO GANTT

v.

STATE OF MARYLAND

_____

Wright,
Reed,
Moylan, Charles E., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: June 4, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

It would be challenging to declare that in this case the 1986 decision of <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69, is robustly alive and well. The mundane reality, however, is that in this case, the raising of a <u>Batson</u> issue is but an opportunistic afterthought on tenuous life-support. Even without <u>Batson</u>, however, the appellant's criminal history has a stubborn vitality of its own that is slowly hardening into local legend.

### The Scourge Of Lexington Park

The appellant is Antonio Warren Gantt. His specialty is bank robbery. For a town the size of Lexington Park (population 11,626 as of the census of 2010), the appellant was for a decade a one-man crime wave. Prior to the two bank robberies which we will be mentioning in fuller detail, the appellant had already compiled a not insignificant criminal history. The first of the actual bank robberies occurred on September 24, 2007, at the Lexington Park branch of the Maryland Bank and Trust. The appellant, single-handedly, walked up to a teller and demanded cash in hundreds and fifties, threatening to kill the teller if she did not comply. The teller turned over to him approximately $22,000. The appellant was not immediately apprehended and remained at large to strike again.

Five weeks later, on October 31, 2007, the appellant, again single-handedly, robbed the same Lexington Park branch of the Maryland Bank and Trust for yet a second time, making off on that occasion with between $43,000 and $44,000. Eight separate witnesses identified him at trial. Three of the tellers were sprayed with gasoline and ordered to go into the back room where the money was stored. The appellant threatened to "kill [them] and burn the bank down" if they did not follow his orders. The appellant herded them into

the vault and shut the door. On that occasion, however, the bank manager was able to turn over to the appellant $1,000 in "bait money." The appellant was shortly thereafter apprehended.

On November 18, 2008, a St. Mary's County jury convicted the appellant of the October 31, 2007, bank robbery. On the next day, November 19, 2008, another St. Mary's County jury convicted the appellant of the September 24, 2007, bank robbery. At a joint sentencing for both sets of convictions on January 16, 2009, the appellant was sentenced, as a subsequent offender, to concurrent terms of life imprisonment without parole for each of the bank robberies.

The appellant took a consolidated appeal to this Court. In an unpublished opinion, we concluded that Rule 4–215 had been violated because the appellant had been permitted to discharge his counsel without having been informed that he was facing the possible sentence in each case of life without parole. Gantt v. State, No. 2704, September Term, 2008, filed on August 24, 2010.

Some indication of the local reaction to the reversals may be had from the August 23, 2011, article in the St. Mary's County Enterprise which quoted one of the exasperated trial judges, upon being informed of the reversals, as saying, "I think the Court of Special Appeals made a very stupid decision . . . . It's obvious I hate him. I think he should be hung. Go get me a rope."[1]

---

[1] The trial judge's rancor would surface again several years later at a hearing considering the appellant's Petition for Post-Conviction Relief.

On September 6, 7, and 8, 2011, the appellant was retried for the October 31, 2007, bank robbery by a St. Mary's County jury, presided over by Judge Karen H. Abrams. The appellant was again convicted. The appellant then took his second appeal to this Court. Gantt v. State, No. 1871, September Term, 2011, filed on April 1, 2013. In a footnote, the opinion of this Court on that occasion took note of the "less than amicable" feeling of the appellant toward the judiciary.

> The mood throughout this pre-trial hearing was less than amicable. At one point the appellant requested that he be at the trial in civilian clothing. In declining that request, Judge Abrams reminded the appellant that he had actually been bound and shackled at his first trial. At one point Judge Abrams advised him that, as a pro se defendant, he was "going to have to show respect for the court or be removed from the courtroom." The appellant responded:
>
> > MR. GANTT: You bitch. You are a bitch. You are a real bitch. I never came into this courtroom and did anything. These officers tazed me and they tape me up. You have the nerve to chastise me about if I act up? You were the ones who abused me. I never abused anyone. So I don't want to hear that shit. We want to go to trial, let's go to trial. Don't chastise me like I came into this courtroom and did something to someone. You want me – you got blood on your –

(Emphasis supplied).

Thus, the cast of characters (the appellant) and the mood of the local community. Feelings were running high.

### The Adjudicatory Saga

Both that second trial of September 6, 7, and 8, 2011, for the October 31, 2007, bank robbery and that second appeal to this Court will be examined in full detail. In that appeal, the appellant raised five contentions. In response to one of the contentions, this Court

3

vacated the enhanced sentence for two of the armed robbery convictions, but we otherwise affirmed the convictions. On the sentencing remand, Judge Abrams sentenced the appellant to a term of 20 years on each of the armed robbery convictions, the sentences to run concurrently. Calhoun v. State, 46 Md. App. 478, 488–89, 418 A.2d 1241 (1980), aff'd, 290 Md. 1, 425 A.2d 1361 (1981); State v. Taylor, 329 Md. 671, 674, 621 A.2d 424 (1993).

On December 13, 2013, the appellant filed a pro se Petition for Post-Conviction Relief. Supplemental Petitions followed on December 20, 2013; on September 26, 2014; on December 27, 2016; and on November 1, 2017. On November 9, 2017, the appellant withdrew all grounds for Post-Conviction Relief not set forth in the "November Supplement."

A Post-Conviction hearing was held before Judge Steven I. Platt on November 9, 2017. On December 21, 2017, Judge Platt filed his order, which permitted the appellant to file a belated Motion for Modification with respect to two counts and which permitted the appellant to file a belated Application for Review of Sentence by a Three Judge Panel. He otherwise denied the Petition for Post-Conviction Relief in all respects.

Of the four issues before Judge Platt at the Post-Conviction hearing, two of them alleged that appellate counsel had been inadequate for failing to raise issues on the second appeal to this Court from the September 8, 2011, conviction for the October 31, 2007, bank robbery. One of the alleged inadequacies of appellate counsel was the failure to appeal the rejection of the appellant's ostensible Batson challenge, the alleged inadequacy now before us. The other alleged appellate inadequacy was counsel's failure to appeal from the denial

4

of the appellant's motion for a change of venue based on the intemperate remarks of the first trial judge to the local newspaper upon the reversal of both bank robbery convictions. The appellant is not now challenging that second alleged appellate inadequacy.

### A Single Contention

On January 9, 2018, the appellant filed an Application for Leave to Appeal to this Court based on his chagrin at failing to prevail at the Post-Conviction hearing. That application was granted on July 17, 2018. In what is now his third appeal to this Court, the appellant raises a single contention:

> **The post conviction court erred in denying Appellant's claim of ineffective assistance of appellate counsel for failing to raise his meritorious <u>Batson</u> issue on direct appeal.**

### <u>Strickland v. Washington</u>: The Two-Pronged Test

Since 1984, the universally accepted test for measuring the Sixth Amendment adequacy of counsel, both trial and appellate, has been <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. In thoroughly analyzing <u>Strickland</u>, this Court in <u>State v. Gross</u>, 134 Md. App. 528, 760 A.2d 725 (2000), <u>aff'd</u>, <u>Gross v. State</u>, 371 Md. 334, 809 A.2d 627 (2002), focused on its two-pronged character.

> The fountainhead is <u>Strickland v. Washington</u>. After pointing out that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," the Supreme Court went on to establish <u>the now classic two-pronged test</u> for making such a determination. It referred to the <u>two distinct elements that had to be analyzed</u> as <u>the "performance component"</u> and <u>the "prejudice component"</u> of the "ineffectiveness inquiry."

5

134 Md. App. at 550 (emphasis supplied; citations omitted).

A number of Maryland cases, incidentally, have discussed and applied Strickland and its two-pronged test. Wiggins v. State, 352 Md. 580, 600–03, 724 A.2d 1 (1999); Oken v. State, 343 Md. 256, 283–95, 681 A.2d 30 (1996); Gilliam v. State, 331 Md. 651, 664–86, 629 A.2d 685 (1993); State v. Thomas, 328 Md. 541, 616 A.2d 365 (1992); Williams v. State, 326 Md. 367, 605 A.2d 103 (1992); State v. Thomas, 325 Md. 160, 169–73, 178–88, 599 A.2d 1171 (1992); Bowers v. State, 320 Md. 416, 424–31, 578 A.2d 734 (1990); State v. Colvin, 314 Md. 1, 5–7, 14–19, 548 A.2d 506 (1988); State v. Calhoun, 306 Md. 692, 728–38, 511 A.2d 461 (1986); State v. Tichnell, 306 Md. 428, 433–57, 509 A.2d 1179 (1986); Harris v. State, 303 Md. 685, 496 A.2d 1074 (1985); State v. Purvey, 129 Md. App. 1, 5–27, 740 A.2d 54 (1999), cert. denied, 357 Md. 483, 745 A.2d 437 (2000); and Cirincione v. State, 119 Md. App. 471, 483–509, 705 A.2d 96, cert. denied, 350 Md. 275, 711 A.2d 868 (1998).

To prevail on a claim that the constitutionally guaranteed assistance of counsel was inadequate, a defendant must satisfy both the performance component and the prejudice component of Strickland. The defendant, moreover, has the burden of proof with respect to each.

**The Performance Prong**

Strickland itself pointed out that the defendant's burden on the performance prong is to prove that counsel's representation was so deficient as to undermine the adversarial process.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made <u>errors so serious that counsel was not functioning as the "counsel" guaranteed</u> the defendant <u>by the Sixth Amendment</u>.

466 U.S. at 687 (emphasis supplied).

In <u>State v. Gross</u>, we pointed out that the standard for appellate comparison is not an "ideal" but only a "reasonable performance."

> <u>Strickland</u> then admonished that counsel is not to be measured against an ideal standard but is to be assessed in terms of whether his lawyerly assistance was "reasonable" and that that is to be measured "under prevailing professional norms[.]"

134 Md. App. at 551.

<u>Strickland</u> was very clear, moreover, that counsel's performance must be measured against prevailing professional norms.

> As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of <u>reasonably effective assistance</u>. . . . When a convicted defendant complains of the ineffectiveness of counsel's assistance, <u>the defendant must show that counsel's representation fell below an objective standard of reasonableness.</u>
>
> . . . .
>
> <u>The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.</u>

466 U.S. at 687–88 (emphasis supplied; citations omitted).

In <u>State v. Gross</u>, we made it clear that the appellate review of counsel's performance must be highly deferential.

> In guarding against too facile a finding of deficient performance by trial counsel, the Supreme Court circumscribed after-the-fact review, by post-conviction court and appellate court alike, with a number of cautionary

admonitions. One of those is that "judicial scrutiny of counsel's performance must be highly deferential" and that reviewing courts should be especially careful not to judge a performance through the distorting lens of hindsight.

134 Md. App. at 552 (emphasis supplied).

As to the standard of review of the adequacy of a performance, Strickland left no doubt.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689 (emphasis supplied; citations omitted).

## The Prejudice Prong

The fact that a given trial tactic proves to be unsuccessful, moreover, does not ipso facto establish that the defendant was prejudiced. Strickland is clear.

> [I]neffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice . . . .

466 U.S. at 693 (emphasis supplied). Strickland went on:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

8

466 U.S. at 694 (emphasis supplied).

In <u>Oken v. State</u>, 343 Md. 256, 681 A.2d 30 (1996), the Court of Appeals discussed <u>Strickland</u>'s prejudice component.

> In order to establish prejudice, Oken must show that there is <u>a substantial possibility that</u>, but for counsel's unprofessional errors, <u>the result of the proceeding would have been different.</u>

343 Md. at 284 (emphasis supplied).

## Adequacy Of Appellate Counsel

With inevitable variations in its appellate application, <u>Strickland</u>'s two-pronged test for the adequacy of counsel operates as surely at the appellate level as it does at the trial level. As this Court observed in <u>State v. Gross</u>:

> <u>The two-pronged test</u> enunciated in <u>Strickland applies to claims of ineffective assistance of appellate counsel just as surely as it does to claims of ineffective assistance of trial counsel.</u>
>
> Although the basic principles enunciated by <u>Strickland</u> remain the same, whether applied to a trial performance or an appellate performance, the juridical events to which those principles apply obviously differ somewhat depending on the operational level being scrutinized.

134 Md. App. at 556 (emphasis supplied; citations omitted).

A major and recurring issue at the appellate level is the selection of which issues, out of a larger totality of issues, to raise on appeal. In <u>Jones v. Barnes</u>, 463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983), the Supreme Court was assessing the constitutional adequacy of appellate lawyering. The United States Court of Appeals for the Second Circuit had granted <u>habeas corpus</u> relief because an attorney had failed to raise on appeal a non-frivolous argument specifically requested by a defendant. In reversing the Second

Circuit, the Supreme Court pointed out that the strategic selection of which appellate issues to raise and which to ignore is one entrusted to the strategic judgment of appellate counsel and is not a matter for second-guessing by an appellate court.

> There can hardly be any question about the importance of having the appellate advocate examine the record with a view to <u>selecting the most promising issues for review. This has assumed a greater importance in an era when oral argument is strictly limited in most courts—often to as little as 15 minutes—and when page limits on briefs are widely imposed.</u> Even in a court that imposes no time or page limits, however, the new <u>per se</u> rule laid down by the Court of Appeals is contrary to all experience and logic. <u>A brief that raises every colorable issue runs the risk of burying good arguments</u>—those that, in the words of the great advocate John W. Davis, "go for the jugular," Davis, <u>The Argument of an Appeal</u>, 26 A.B.A.J. 895, 897 (1940)—<u>in a verbal mound made up of strong and weak contentions.</u>

463 U.S. at 752–53 (emphasis supplied; citation omitted).

In <u>Smith v. Murray</u>, 477 U.S. 527, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986), the Supreme Court reaffirmed the tactical role of appellate counsel in assessing the relative strengths and weaknesses of various arguments and in then choosing, as a matter of trial tactics, which to push and which to ignore.

> After conducting a vigorous defense at both the guilt and sentencing phases of the trial, counsel surveyed the extensive transcript, researched a number of claims, and decided that, under the current state of the law, 13 were worth pursuing on direct appeal. <u>This process of "winnowing out weaker arguments on appeal and focusing on" those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.</u>

477 U.S. at 535–36 (emphasis supplied).

At the appellate level, the prejudice prong as well as the performance prong must be satisfied. <u>Smith v. Robbins</u>, 528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000), makes it clear that the burden remains on the defendant to demonstrate prejudice at the

appellate level by showing that had the unraised argument been raised, the appeal would probably have been successful.

> If Robbins succeeds in such a showing [of a deficient performance], he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

528 U.S. at 285 (emphasis supplied).

In Newton v. State, 455 Md. 341, 168 A.3d 1 (2017), Judge Adkins wrote for the Court of Appeals:

> As to the performance prong, "[t]he Sixth Amendment does not require an attorney to argue every possible issue on appeal." . . . . Therefore, appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."

455 Md. at 363 (emphasis supplied; citations omitted).

## The Selection Of Appellate Issues

In a relativistic world, the manager who has both a Ruth and a Cobb in his starting line-up will not be second-guessed for having left even a DiMaggio on the bench. Appellate counsel are well advised to be highly selective in choosing contentions and then to go with the best. Even good contentions may prudently be ignored if they are less than the best. As this Court noted in State v. Gross:

> We are not suggesting for a moment that Gross's claims with respect to the DNA evidence were frivolous. An effective performance by appellate counsel, however, does not require that every claim, even if non-frivolous, be raised on appeal. Smith v. Robbins observed in this regard:
>
> > [A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may

11

> select from among them in order to maximize the likelihood of success on appeal.

134 Md. App. at 562–63 (some emphasis supplied; citation omitted).

The Supreme Court similarly observed in Jones v. Barnes:

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.

463 U.S. at 751–52 (emphasis supplied). The Supreme Court quoted with approval from the 1980 Manual of the Association of the Bar of the City of New York on practice before the Second Circuit.

> "[A] brief which treats more than three or four matters runs serious risks of becoming too diffuse and giving the overall impression that no one claim of error can be serious."

463 U.S. at 752 n.2 (emphasis supplied).

### Selection Of Issues In This Case

In assessing the legal adequacy of appellant's counsel in this case, our focus is exclusively appellate. At the appellant's retrial of September 6, 7, and 8, 2011, for the bank robbery of October 31, 2007, the appellant was, at the outset of the trial, permitted to fire his lawyer. Not being entitled to a replacement, he represented himself throughout the trial. The Office of the Public Defender assumed the representation of the appellant only for his subsequent appeal. On appeal, counsel for the appellant raised the following five contentions:

> 1. that the court erroneously imposed multiple sentences of life imprisonment without parole;

2. that the court erroneously denied his motion to have the court appoint counsel for him;

3. that the court erroneously advised him with respect to his right to testify;

4. that the court erroneously denied his request to summon defense witnesses or, in the alternative, erroneously denied his motion to postpone the trial; and

5. that the court erroneously limited him to ten peremptory juror challenges.

The appellant's brief complied with the word limit imposed by Rule 8–503. The unpublished opinion of this Court ran to 27 pages. Each of the contentions, moreover, had solid merit.

## A. Multiple Sentences Of Life Without Parole

The appellate attack on three concurrent sentences of life imprisonment without parole not only had solid merit; it ultimately prevailed and caused this Court to vacate the sentences and to remand the case for resentencing. It was, self-evidently, a contention worthy of being raised.

## B. Maryland Rule 4–215 And Self-Representation

From the beginning of this series of bank robbery trials, the appellant had serious ongoing differences with his assigned assistant public defender and at one point actually threatened to kill him. At the outset of the September 2011 trial now being considered, the appellant was permitted to fire the assistant public defender in question but was not eligible for replacement counsel. Our earlier opinion of April 1, 2013, described the issue.

> On July 21, 2011, Judge Abrams granted the appellant's request to discharge Mr. Getz but ruled that the appellant's reasons were not meritorious. She found Mr. Getz to be "fully competent, extremely

13

competent." She ruled that the appellant was "not entitled to an attorney of your choice as long as you have competent counsel." Judge Abrams's opinion strongly suggested that the appellant was deliberately manipulating the system in order to cause trouble:

> He's been advised of everything. [I]f I accept the doctor's evaluation that everything he does, he knows what he's doing and he's doing it on purpose, then I have to believe that what he's doing . . . on the issue of counsel is on purpose and with – with a potential – with a possibility that if Mr. Getz is not going to represent him and that maybe we'll find him another attorney that he likes better or maybe we won't find him an attorney, but either way, he's prolonging the process and he's avoiding the trial, he's avoiding the Motions hearings that we're having here, he's not letting them take place.
>
> In fact, the only way they've taken place today is because I've taken him away from the Courtroom. So I think that he has in fact waived his right to counsel and there is absolutely no meritorious reason for him – for Mr. Getz to be removed at his request and – and he has given the Court no choice, no ability to give him counsel.

(Emphasis supplied).

Our opinion on appeal affirmed that decision of Judge Abrams to deny the appellant any further governmental representation.

> A sense that a litigant is trying to "manipulate" the legal system is just as legitimate a sensitivity as any other aspect of a credibility determination. In a case such as this, it may be especially pertinent. A manipulative decision to fire one's lawyer is less likely to have been a meritorious decision. Maryland Rule 4–215 is a procedural minefield for a trial judge, with an inadvertent misstep in attempting to traverse it by no means unusual. For a cagey defendant with no hope of relief on the merits of guilt or innocence, creating as much Rule 4–215 turmoil as possible may be a far more promising path to appellate reversal than would be reliance on the evidentiary merits. The only sure antidote for such stratagems is the psychological sensitivity of the judge on the field in getting a "feel" for what is really going on behind the spoken or written words. On appellate review, of course, we defer to the infinitely superior vantage point of the judge in the courtroom to

hear the tones, observe the expressions, and be aware of the total background as the conflict unfolds in front of her.

(Emphasis supplied).

The merits are no longer before us, but for a defendant, even an obstreperous one, to go to trial without a lawyer and to be sentenced to life imprisonment without the possibility of parole was obviously a very grave matter. The periodic confrontations between the defendant and the trial judge, already alluded to, only exasperated a very difficult situation. Because of its implications, this contention obviously had weight and was self-evidently appeal-worthy.

## C. The Right To Testify Versus The Right Not To Testify

On his third contention, appellate counsel (or the appellant himself) sought to exploit the tension between "two separate but equal constitutional rights"—the right not to testify pursuant to the Fifth Amendment privilege against compelled self-incrimination and the right to testify pursuant to the Sixth Amendment right to present witnesses. When he was explained "the pros and cons of either choice," the appellant sought at first to avoid the cons by testifying as an expert witness.

> MR. GANTT: <u>I wish to testify as an expert witness to give my analysis on [the prosecutor's] case and his report.</u>
>
> THE COURT: <u>Well, Mr. Gantt. You can't do that. You can testify as a fact witness, but</u> you – <u>you need to understand the potential consequences of your testimony.</u>
>
> <u>If you testify</u>, and you may if you wish as to your version of the events, of what you have alleged has happened or didn't happen, but then <u>you open the door for [the prosecutor] to go into your background</u> and to testify – <u>to</u>

ask you questions about any criminal convictions that you have, any prior involvement with the law and so forth and to explore that with you –

MR. GANTT: Okay.

THE COURT: – which can often be prejudicial in front of a jury. So I need to know – I can't qualify you as an expert. You can make any argument you want when your time comes for closing argument, but – within the confines of the law, that is, but I need to know whether you want to waive your right to testify or whether you want to get on the stand to testify knowing what the potential risks are.

MR. GANTT: Well, I won't be testifying then.

(Emphasis supplied).

After properly warning the appellant that he could be cross-examined about his convictions for robbery, forgery, escape, and conspiracy, Judge Abrams may have committed a minor glitch with respect to second-degree assault. The appellant seized upon the glitch with this third contention. This Court's decision was hard pressed to prevent the appellant from exploiting the minor glitch.

This case does not remotely present a Morales situation. Initially, it absolutely defies logic that the appellant would have readily exposed to the jury his numerous convictions for life endangering felonies in his desire to testify but suddenly would have changed his mind because of the fear that the jury would learn about a couple of second-degree assaults.

In this case, moreover, we can glean from the record no inkling that the appellant ever wanted to testify as a fact witness. He did not so testify at his earlier trial. He did not so testify at his retrial for the September 24, 2007, bank robbery, which took place one week before trial in this case. The appellant made no proffer as to what his testimony would have been, and we cannot imagine what relevant and helpful testimony he could have offered with respect to the bank robbery of October 31, 2007.

What the appellant clearly wanted was a platform from which he could expostulate about what had been done wrong by the prosecution and

16

the police and the court system (and, quite possibly, the public defender's office and Mr. Getz). This was precisely why he requested that he be allowed to testify "as an expert witness to give my analysis on the [prosecutor's] case and his report." It was when Judge Abrams assured him that "you can make any argument you want when your time comes for closing argument," that he indicated his satisfaction with that arrangement: "Well, I won't be testifying then."

We hold that no advice given by Judge Abrams operated to dissuade the appellant from exercising his desire to testify as a fact witness.

(Emphasis supplied). For present purposes, however, this was, by any standard of measurement, a clever contention and an addition to the appellant's arsenal of unpredictable import.

## D. Subpoenas For Witnesses And A Request For A Continuance

The fourth contention chosen by counsel concerned the procedural requirements for issuing subpoenas for witnesses. This Court's opinion of April 1, 2013, recounted the exchange between the appellant and Judge Abrams on this subject.

THE COURT: Alright. Well, the problem with your request for witnesses is that it was not filed with the clerk's office until August 31st which was last Wednesday. There had been – there's no possible way of getting subpoenas out for any of these people . . . I don't know who most of these people are, if in fact they are important fact witnesses, then I'm sure that the detention center personnel will help you get on the phone and try to locate some of these people.

MR. GANTT: You telling me that I sent the notice to the (inaudible)? I sent the notice to request the court, to the prosecutor, and to . . . the sheriff requesting witnesses and you're telling me that you can't have my witnesses here. That's a violation of my constitutional rights.

THE COURT: Okay. I – I cannot have your witnesses here. It's up to you to do that in a timely manner so that they can be subpoenaed.

17

MR. GANTT: Okay. From – well, let me ask you this question, <u>from July 21st when you discharged John Getz when I became my own lawyer, when was I suppose to request witnesses</u>? How much time did I have in a timely manner? <u>Don't forget he had ten months and subpoenaed no one.</u> So now you're telling me that you gave me a month and a half to subpoena witnesses, but when was my timely manner suppose to be . . . ?

THE COURT: In sufficient time for the clerk's office to be able to process subpoenas, send them to the . . . sheriff's department, and the sheriff's department to send personnel out to serve them.

MR. GANTT: Well, the point is –

THE COURT: <u>Five days is not enough.</u>

MR. GANTT: Let me say this, <u>all the witnesses that I subpoenaed, they are already witnesses that the prosecutor subpoenaed.</u>

THE COURT: <u>Well, then you're alright then.</u> . . . I'm not disallowing your witnesses to be here. You may get them here any way you wish.

(Some emphasis supplied).

The contretemps about subpoenas immediately segued into a spirited discussion of the appellant's request for postponement.

MR. GANTT: . . . <u>I want to ask for a postponement then. This is the first postponement I've had. If you're not going to allow my witnesses to be here which I subpoenaed them</u> –

THE COURT: <u>I'm not disallowing your witnesses to be here. You may get them here any way you wish.</u>

MR. GANTT: I have no way to do that. . . . If . . . the court can't process my witnesses and subpoena them in time, well, <u>I'm asking for a postponement until you do so.</u> That's what I respectfully request.

THE COURT: <u>I'm not going to postpone the case.</u> This has been set. This had been especially set. <u>We've cleared my docket for the rest of the week so that this trial can go</u> –

18

MR. GANTT: <u>Well, it's going to be obvious when your (inaudible) conviction gets appealed, Ms. Abrams, because you're making every excuse you can.</u> All I want to do is get my witnesses into the courtroom. You only gave me a month and a half to do anything.

THE COURT: <u>Mr. Gantt, while you were refusing to talk to [your defense counsel] for ten months, you needed to be working on your case yourself.</u>

MR. GANTT: <u>There you go. Hiding behind [defense counsel] . . . You bitch. That's all you do is hide behind [defense counsel]. You are a real bitch. That's what you are. . . . You won't give me my witnesses, you won't give me a lawyer, you won't give me a postponement.</u> You give – you give attorneys six months – 180 days to prepare a defense for their . . . clients, but you won't even give me a postponement to get – <u>you won't even extend this trial for a few days until – just until the witnesses are subpoenaed?</u> Why can't you just do that?

THE COURT: I can't.

MR. GANTT: <u>You don't want me to have a fair trial.</u> . . . I never had a chance to be my own lawyer. I went out – I was – for the past ten months, I wasn't my own counsel so I just became my own counsel on the 21st and <u>you won't even allow me an extension of time to subpoena witnesses?</u>

THE COURT: Mr. Gantt, when you spent all that time refusing to talk to [defense counsel] you knew then you were going to be your own attorney.

(Emphasis supplied).

Our response on appeal was sure, but it took some pages of legal analysis to get to that point. That is a tell-tale sign of a thorny contention.

<u>This case had long been set for trial. The court calendar had been cleared for a full week of trial. A full jury panel had been summoned. Numerous witnesses had been summoned. We hold that Judge Abrams did not abuse her discretion in refusing to continue this case.</u>

(Emphasis supplied).

19

This combined contention about the trial court's denial of the appellant's request for witness subpoenas and then about the court's denial of the appellant's request for a trial postponement generated spirited argument on appeal. The tactical decision to choose it for appellate argument over a lame and unpreserved argument over a single <u>Batson</u> challenge is not for us to second-guess.

## E. Ten Peremptory Challenges And Life Imprisonment Without Parole

Albeit unpreserved, the fifth and final contention that appellate counsel opted to pursue concerned limiting the appellant to ten peremptory challenges. Although on this argument, the appellant did not prevail, it was nonetheless a clever argument on which there is painfully little caselaw. Of all the charges against the appellant, the most serious single charge was robbery, which, to be sure, would confer on the appellant only ten peremptory challenges. The appellant's argument was that because combinations of convictions subjected the appellant to an enhanced sentence of life imprisonment without parole, he should thereby be entitled to twenty peremptory challenges because of the severity of that aggregate and ultimate sentence. After a brief discussion, this Court held against the appellant on the merits of that contention. As a backdrop argument, however, we did rely on the general disinclination of an appellate court to indulge a request to notice plain error.

> Even if, purely <u>arguendo</u>, the appellant were right about his entitlement to peremptories, however, the dispositive answer to the contention would be that it has not been preserved for appellate review. The appellant recognizes this and asks us to notice plain error. Even if we thought there had been error in this regard, we would, in the exercise of our discretion, decline to take notice of it.

## F. The Bottom Line

As a deliberate strategic decision, appellate counsel selected five plausible and cogent contentions to pursue on appeal. As an equally deliberate strategic decision, appellate counsel decided not to diminish the possible force of those contentions by diluting them with other probably less persuasive arguments. Counsel sagely followed the Supreme Court's admonishment in <u>Jones v. Barnes</u> as it quoted with approval Justice Robert Jackson's article <u>Advocacy Before the Supreme Court</u>, 25 Temple L.Q. 115, 119 (1951).

> "One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. <u>Legal contentions, like the currency, depreciate through over-issue.</u> The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But <u>receptiveness declines as the number of assigned errors increases.</u> Multiplicity hints at lack of confidence in any one . . . . <u>[E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one."</u>

463 U.S. at 752 (emphasis supplied).

In that same opinion of <u>Jones v. Barnes</u>, the Supreme Court quoted with approval R. Stern, <u>Appellate Practice in the United States</u>, 266 (1981):

> "Most cases present only one, two, or three significant questions . . . . Usually, . . . <u>if you cannot win on a few major points, the others are not likely to help</u>, and <u>to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention.</u> The effect of adding weak arguments will be <u>to dilute the force of the stronger ones."</u>

<u>Id</u>. (Emphasis supplied).

In holding, as we hereby do, that appellate counsel was not in any sense inadequate for failing to pursue the <u>Batson</u> issue on appeal, our conclusion as to appellate counsel's

21

adequacy in this case parallels precisely our conclusion with respect to appellate counsel's adequacy in State v. Gross:

> It cannot seriously be contended that the issues not raised on Gross's appeal to this Court were "clearly stronger than those presented." It cannot seriously be maintained that appellate counsel failed to select the stronger arguments available to him "in order to maximize the likelihood of success on appeal." It cannot seriously be said that "appellate counsel's choice of issues for appeal . . . [fell] below an objective standard of reasonableness."

134 Md. App. at 570 (emphasis supplied).

## The Batson Challenge:
## Inherent Procedural Weaknesses

Quite aside from the relative force and probity of the contentions that counsel chose to advance, several inherent procedural flaws in the potential Batson challenge itself reinforce the wisdom of counsel's decision not to appeal it. Just as our earlier analysis, under the subhead "Selection Of Issues In This Case," was of the relative strength of the appellate contentions that were raised, this immediate analysis is of the relative weakness of the contention that was not raised. In making a prudent selection, one needs to take note of both the assets of the option chosen and the demerits of the option rejected. Before even addressing the ultimate substantive merits, we note two possibly crippling procedural flaws. The appellant will, no doubt, protest these possible procedural flaws strenuously, but it cannot be gainsaid that even an arguable procedural flaw is a relative weakness.

## A. Non-Preservation

The appellant's Batson challenge was not indisputably preserved for appellate review. Merely alluding to a complicated subject that may call for further exploration is

not the express lodging of a loud and clear objection necessary to preserve an objection for appellate review. Maryland Rule of Procedure 4–323(c) clearly provides:

> For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court.

(Emphasis supplied).

There is, moreover, a single standard for assessing the procedural adequacy of an objection. The fact that when a possible Batson issue first arose in this case, the appellant was representing himself pro se does not alter the requirements for preserving an objection for appellate review. As Judge Cathell wrote for this Court in Tretick v. Layman, 95 Md. App. 62, 619 A.2d 201 (1993):

> [T]he procedural, evidentiary, and appellate rules apply alike to parties and their attorneys. No different standards apply when parties appear pro se.

95 Md. App. at 86 (emphasis supplied).

At the commencement of the trial, the appellant discharged the assistant public defender who had been representing him and undertook the pro se defense of his own case. At that point, the trial was proceeding to the jury selection process. At some undesignated point, the State exercised one of its peremptory challenges against an Afro-American woman.[2] The appellant did not lodge any immediate objection. After the appellant had exercised the last of his peremptory strikes, however, the following exchange took place.

---

[2] There appears to be in the briefs some confusion as to the jury number of the prospective juror who was struck, but this had no effect whatsoever on the resolution of this issue. "In explaining his reasons for striking the challenged juror, the prosecutor

23

THE COURT: Okay. Mr. Gantt, you don't have any more strikes, but you're satisfied with the jury?

MR. GANTT: No, ma'am, I'm not. Because the racial diversity in my jury pool, the amount of African Americans, I'm entitled to a jury of my peers. [The prosecutor] actually struck one African American woman. On the other hand, I've chosen lots of them and I – I don't think [the prosecutor] should have struck an African American female because there was no reason for him to do that. This is basically unfair. It's basically undiversed. The only reason for him to strike this woman.

THE COURT: Alright. Well, Mr. Gantt, the same reason I didn't ask any questions of why you wanted to strike people, because it is your prerogative. I don't get to ask any questions of [the prosecutor] because that is his prerogative.

So unfortunately that's just how it played out in this particular regard.

So you don't have any other strikes, we have to go with the jury that we have.

Alright. The rest of you who were not chosen, [I'm] going to go ahead and excuse you. You're welcome to stay if you'd like to watch. You're more than welcome. Otherwise, please call back after 4:15 as to when you need to report again.

MR. GANTT: Your Honor, for the record, would you excuse me, respectfully, I never said I had a problem with my jury. I said I had a problem with the State's Attorney striking an African American from the jury.

THE COURT: I – I understood that. I did understand that.

MR. GANTT: Thank you.

referred to the challenged juror as Juror No. 144. This appears to be an error: the transcript reflects that Juror No. 144 had been excused earlier due to a scheduling conflict, and there is no reference to Juror No. 144 during the selection process itself. Instead, it appears that the prosecutor intended to refer to Juror No. 160, a female juror who was struck by the State, thus allowing Juror No. 163 to join the jury." This all, of course, has absolutely nothing to do with the merits of the issue.

24

(Emphasis supplied).

At that point, Judge Abrams swore in the jury panel, addressed several housekeeping matters, and excused the jury for a brief recess. During that recess for the jury, the Assistant State's Attorney, <u>sua sponte</u>, addressed the court.

> [PROSECUTOR]: Your Honor, can I – can I be heard for a second?
>
> THE COURT: Yes?
>
> [PROSECUTOR]: And I – <u>I know the Court didn't ask me why I struck juror number 144, but seeing as how it was raised by the defense, I'd like the record to be clear that I struck juror number 144 who is an African American to get to juror 163 who I've felt through appearances would be more favorable</u>, quite simply to the State in hearing the evidence.
>
> <u>I was impressed with his appearances, his looks.</u> As you well know, we don't have a lot of information other than gut to make our decisions. <u>That decision was made as a gut decision. It was not a racially prejudicious decision by the State.</u>
>
> Thank you, Your Honor.

(Emphasis supplied).

To that unsolicited offering of a race-neutral reason for the peremptory strike, Judge Abrams responded affirmatively.

> THE COURT: And I think, for the record, juror 345 who I thought was rightfully stricken for cause was also African American and, unfortunately, we don't have a large population of African American people. It happens all the time with our jurors that – that we don't have a lot of African American people and – but <u>I've never known any prejudice in that regard and I certainly wouldn't tolerate it if I thought there was.</u>
>
> Alright. We'll take a recess.

(Emphasis supplied).

25

The trial then went forward without a word being said by the appellant. There was no request made of the court. There was no objection to how the court had handled the matter. Buried unseen, of course, in that seemingly informal exchange was the elaborate three-step analysis designed by the Supreme Court in Purkett v. Elem, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995), to resolve Batson challenges. The appellant never claimed that the State's exercise of a single peremptory was presumptively racially discriminatory, thereby compelling Judge Abrams to insist that the State come forward with a race-neutral reason for the peremptory strike. The appellant never claimed that the reason for the strike advanced by the State was on its face not race-neutral. The appellant never claimed that Judge Abrams abused her discretion in implicitly accepting the State's explanation. One does not engage the gears of the elaborate Purkett v. Elem machinery simply by yelling, "Batson!" The trigger is a bit more complicated than that.

The case continued until the next day, when the jury returned a verdict of guilty on all counts. The name Batson was never whispered nor was the peremptory strike ever again alluded to. A Batson v. Kentucky challenge "should be made of sterner stuff."[3] With no Batson challenge having been raised before this Court on direct appeal, there was no request that the Court overlook non-preservation by taking notice of "plain error." At the Post-Conviction hearing before Judge Platt, there was no suggestion that he take notice of "plain error." In the present appeal, there has been no request that we take notice of "plain error." Had there been, Newton v. State would have advised:

---

[3] Shakespeare, Julius Caesar, Act III, Scene II.

26

Because the issue was not preserved at trial, Newton would only have prevailed on the claim if the court concluded that it was plain error.

. . . .

It is "rare" for the Court to find plain error.

455 Md. at 364.

Non-preservation, in and of itself, was a dispositively debilitating reason why appellate counsel did not on appeal raise an issue, which procedurally as well as substantively was going nowhere. Counsel was not thereby ineffective. As this Court stated in State v. Gross:

> It would seem to be the soundest of appellate strategies not to waste precious pages and precious minutes pushing an issue that has not been preserved for appellate review.

134 Md. App. at 571.

## B. Waiver

Albeit in a sense at least intertwined with non-preservation, there is an additional procedural infirmity with the Batson challenge in this case. The appellant waived it. At the very end of the brief exchange in which he first raised the issue, the appellant accepted the jury.

> MR. GANTT: Your Honor, for the record, would you excuse me, respectfully, I never said I had a problem with my jury. I said I had a problem with the State's Attorney striking an African American from the jury.

That is a fascinating human reaction, seemingly of first impression, with which to wrestle. In a single breath, the appellant protested the use of the peremptory strike but happily accepted the jury it produced. Which opposing emotion shall prevail? How does

27

the law handle mixed emotion?[4] In <u>Gilchrist v. State</u>, 340 Md. 606, 667 A.2d 876 (1995), the Court of Appeals described the detoxifying effect that an expression of "satisfaction with the jury" has on a "claim of error" about the selection process.

> This Court in a series of cases has taken the position that <u>a defendant's claim of error in the inclusion or exclusion of a prospective juror</u> or jurors "<u>is ordinarily abandoned when the defendant</u> or his counsel <u>indicates satisfaction with the jury</u> at the conclusion of the jury selection process."

340 Md. at 617 (emphasis supplied; citations omitted).

After citing eight other Maryland opinions in support of that position, Judge Eldridge's opinion went on to explain:

> <u>When a party complains about the exclusion of someone from</u> or the inclusion of someone in <u>a particular jury, and thereafter states</u> without qualification <u>that the same jury as ultimately chosen is satisfactory</u> or acceptable, <u>the party is clearly waiving or abandoning the earlier complaint about that jury.</u> The party's final position is directly inconsistent with his or her earlier complaint.

340 Md. at 618 (emphasis supplied).

On this issue of possible first impression, even if, <u>arguendo</u>, the appellant were to prevail philosophically that half a waiver (or a half-hearted waiver) is effectively no waiver at all, it would profit him little in this particular case. He seems to be saying that even if he is happy with the result, the State should nonetheless be sanctioned for its inappropriate behavior. That, of course, would be the application of an exclusionary principle, the policing of the police, the regulation of governmental behavior even if the ostensible victim

---

[4] It is the converse of Voltaire's "I may disagree with what you have to say, but I shall defend to the death your right to say it." The appellant seems to say, "I may be happy with what you did, but I will protest with my dying breath the fact that you did it."

28

has suffered no prejudice. "The criminal is to go free because the constable has blundered."[5] That might be fine as far as the performance prong is concerned. In a two-pronged test, such as the Strickland v. Washington standard now being urged upon us, there is also the prejudice prong that must be independently satisfied. It is with respect to the prejudice prong that the appellant's expression of satisfaction with his jury is toxic to his claim of error. Even if he did not waive Strickland v. Washington in toto, he waived the prejudice prong and that was fatal.

## C. The Combined Procedural Flaws

We remind ourselves that it is the effectiveness of appellate counsel that we are evaluating as we look at the charge that he flagrantly failed to raise the Batson issue on his direct appeal to this Court. Quite aside from the fact that counsel had other and better issues to raise and quite aside from the fact that the issue had little or no intrinsic merit (as we shall analyze infra), these potentially fatal procedural deficiencies of 1) non-preservation and 2) waiver further debilitated an already infirm tactical option. As this Court observed in State v. Gross:

It is not a strategic blunder to refrain from pushing losers.

134 Md. App. at 571.

### The Batson Merits:
### The Purkett v. Elem Three-Step

---

[5] Benjamin Nathan Cardozo in People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585 (1926).

29

Even if, arguendo, the appellant had preserved his <u>Batson</u> challenge and not waived his <u>Batson</u> right and even if, <u>arguendo,</u> this was the lone contention he had to raise, he still could have gone nowhere on the <u>Batson</u> merits. In 1991, <u>Hernandez v. New York</u>, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395, followed four years later by <u>Purkett v. Elem</u>, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834, mapped out the judicial game plan for handling almost all <u>Batson v. Kentucky</u> challenges.

In <u>Hernandez v. New York</u>, the Supreme Court fully set out the three-part test:

> In <u>Batson,</u> we outlined <u>a three-step process for evaluating claims</u> that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. The analysis set forth in <u>Batson</u> permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process. <u>First, the defendant must make a prima facie showing</u> that the prosecutor has exercised peremptory challenges on the basis of race. <u>Second</u>, if the requisite showing has been made, <u>the burden shifts to the prosecutor to articulate a race-neutral explanation</u> for striking the jurors in question. <u>Finally, the trial court must determine whether the defendant has carried his burden</u> of proving purposeful discrimination.

500 U.S. at 358 (emphasis supplied; citations omitted).

The Court of Appeals was fully on board with <u>Whittlesey v. State</u>, 340 Md. 30, 665 A.2d 223 (1995).

> When a criminal defendant raises a <u>Batson</u> claim, the trial judge must follow a three-step process. <u>The burden is initially upon the defendant</u> to make a <u>prima facie</u> showing of purposeful discrimination [step one]. If the requisite showing has been made, "'<u>the burden shifts to the State</u> to come forward with a neutral explanation for challenging black jurors'" [step two]. "<u>Finally, the trial court must determine</u> whether the defendant has carried his burden of proving purposeful discrimination" [step three].

340 Md. at 46–47 (emphasis supplied; citations omitted).

## A. Step One: An Express Objection, Loud And Clear

30

The burden is initially on the opponent of a peremptory challenge, such as the appellant here, to raise a Batson issue by articulating a prima facie case that one or more peremptory strikes were exercised for a discriminatory purpose forbidden by Batson. Although the burden of making out a prima facie case is a low burden, it is nonetheless a burden cast on the opponent of the strike. There is no sua sponte burden initially on the proponent of the strike or upon the trial judge to do anything. In Edmonds v. State, 372 Md. 314, 812 A.2d 1034 (2002), the Court of Appeal elaborated.

> Unless challenged, a proponent of a peremptory challenge need not offer any explanation. The prosecutor did not have to proffer any reason for the exercise of the peremptory challenges until petitioner's Batson challenge. Moreover, no explanation was due until the judge ruled as to whether petitioner made a prima facie showing of intentional discrimination.

372 Md. at 335 (emphasis supplied; citation omitted).

In this case, as the appellant was asked by the trial judge whether he was satisfied with the jury, he replied:

> No, ma'am, I'm not. Because the racial diversity in my jury pool, the amount of African Americans, I'm entitled to a jury of my peers. [The prosecutor] actually struck one African American woman. . . . I don't think [the prosecutor] should have struck an African American female because there was no reason for him to do that. This is basically unfair. It's basically undiversed.

Although the progression from step one to step two would ordinarily consist of the trial judge's determination that a prima facie case of discrimination had been made out and that the proponent of the peremptory strike should, therefore, be required to offer an explanation for the strike, this stage in the progression is frequently bypassed. On many occasions, the proponent of the strike spontaneously steps up, as did the State in this case,

and offers an explanation for a strike even when not literally having been required to do so. As <u>Hernandez v. New York</u> explained:

> The prosecutor defended his use of peremptory strikes without any prompting or inquiry from the trial court. As a result, <u>the trial court had no occasion to rule that petitioner had or had not made a prima facie showing</u> of intentional discrimination. <u>This departure from the normal course of proceeding need not concern us.</u> . . . . <u>Once a prosecutor has offered a race-neutral explanation</u> for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the <u>preliminary issue of whether the defendant had made a prima facie showing becomes moot.</u>

500 U.S. at 359 (emphasis supplied).

Any analysis of step one in the case now before us is accordingly moot.

## B. Step Two: He Loved Not Caesar Less, But Only Rome More[6]

That analysis passed automatically from step one to step two. The State, without being asked to do so, spontaneously offered an explanation for its peremptory strike.

> I know the Court didn't ask me why I struck juror number 144, but seeing as how it was raised by the defense, I'd like the record to be clear that <u>I struck juror number 144</u> who is an African American <u>to get to juror 163 who I've felt through appearances would be more favorable</u>, quite simply to the State in hearing the evidence.
>
> I was impressed with his appearances, his looks.

(Emphasis supplied). The Assistant State's Attorney, like Brutus, loved not Juror No. 144[7] less, but only Juror 163 more. That, as the caselaw abundantly confirms, is a race-neutral reason.

---

[6] The hard choice confronting Brutus in Shakespeare's <u>Julius Caesar</u>, Act III, Scene II.

[7] Or, perhaps, it was Juror No. 160. See note 2 <u>supra</u>.

That, moreover, is all that is required at step two of the <u>Batson</u> analysis. The proponent of the peremptory strike is required to offer a facially neutral explanation for the strike. It is not yet necessary for the trial judge to credit or give any weight to the explanation. That will ultimately be required, of course, but that is a step three evaluation, not a step two evaluation. <u>Purkett v. Elem</u> explained:

> <u>The second step of this process does not demand an explanation that is persuasive, or even plausible.</u> "At this [second] step of the inquiry, <u>the issue is the facial validity of the prosecutor's explanation.</u> Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

514 U.S. at 767–68 (emphasis supplied; citation omitted).

<u>Hernandez v. New York</u> elaborated on this theme of facial validity or facial neutrality.

> A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. <u>Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.</u>

500 U.S. at 360 (emphasis supplied).

Picking up on that language from <u>Purkett v. Elem</u> and from <u>Hernandez v. New York</u>, Judge Raker wrote for the Court of Appeals in <u>Edmonds v. State</u>, 372 Md. 314, 812 A.2d 1034 (2002):

> <u>An explanation</u> must be race-neutral, but it <u>does not have to be persuasive or plausible. Any reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation.</u> If the defending party offers a race-neutral reason, the challenging party must demonstrate that the offered explanation merely is a pretext for a discriminatory intent or purpose.

372 Md. at 330 (emphasis supplied; citations omitted). The <u>Edmonds</u> opinion further explained:

> A neutral explanation has been defined as "an explanation based on something other than the race of the juror. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." <u>The question presented is the facial validity of the reasons offered by the State. Whether a reason is persuasive is not relevant at this stage of the inquiry.</u> The prosecutor's burden of production under step two is limited. <u>The State had to produce a race-neutral reason, not a believable one.</u> A trial court meets its obligation under step two by requiring the proponent of the strike to offer a race-neutral explanation for the peremptory challenge.

372 Md. at 332 (emphasis supplied; citations omitted).

To get rid of any prospective juror for the affirmative purpose of seating a more desirable juror is facially a non-discriminatory purpose not forbidden by <u>Batson</u>. That is all that step two requires.

## C. Step Three: All Quiet On The <u>Batson</u> Front

Once the opponent of a peremptory strike has made out a <u>prima facie</u> case of a <u>Batson</u> violation, the trial judge's only role at step two is to require the proponent of the strike to offer an explanation for the strike. It is not yet for the trial judge to make an assessment for the explanation. That comes at step three. It more than comes at step three. It is step three.

<u>Batson</u> itself made it clear that appellate review of the trial judge's decision in that regard will be highly deferential.

> "[A] finding of intentional discrimination is a finding of fact" entitled to appropriate deference by a reviewing court. Since the trial judge's findings in the context under consideration here largely turn on evaluation of

34

credibility, a reviewing court ordinarily should give those findings great deference.

476 U.S. at 98 n.21 (emphasis supplied; citations omitted).

When probing the purpose or intent behind a peremptory strike, the answer lies self-evidently in the head of the person executing the strike. By definition, it is not an objective matter. Absolutely critical is the trial judge's assessment of the credibility of the attorney offering his explanation of why he did what he did. Hernandez v. New York took pains to point this out.

> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding "largely will turn on evaluation of credibility." In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

500 U.S. at 365 (emphasis supplied; citations omitted).

The Hernandez v. New York analysis concluded:

> The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.

500 U.S. at 367 (emphasis supplied).

In Edmonds v. State, the Court of Appeals put its imprimatur on this highly deferential standard of appellate review.

> The ultimate burden of proving that a peremptory challenge was motivated by race always remains with the opponent of the challenge. The

35

> trial judge's findings in evaluating a <u>Batson</u> challenge <u>are</u> essentially factual and <u>accorded great deference on appeal. Whether a reason is race-neutral rests in large part on a credibility assessment of the attorney exercising the peremptory challenge. The trial judge is in the best position to assess credibility</u> and whether a challenger has met his burden. Accordingly, on appellate review, we "<u>will not reverse a trial judge's determination</u> as to the sufficiency of the reasons offered <u>unless it is clearly erroneous.</u>"

372 Md. at 331 (emphasis supplied; citations omitted).

When at the appellant's trial on September 7, 2011, the Assistant State's Attorney offered her ostensibly race-neutral reason for striking Juror No. 144, Judge Abrams implicitly found that explanation to be credible. She concluded, "I've never known any prejudice in that regard and I certainly wouldn't tolerate it if I thought there was."

If, <u>arguendo</u>, this <u>Batson</u> issue were before us on the merits, we would defer to the not clearly erroneous factfinding of Judge Abrams. Alternatively, in a non-hypothetical context, we defer to the factfinding and to the legal ruling of Judge Platt at the Post-Conviction hearing, as he in turn found and ruled that there had been no <u>Batson</u> violation.

> The Court's response clearly shows that she did not and would not find that the peremptory strike of the African American juror was on racial grounds.

In the words of <u>Hernandez v. New York</u>, "once that has been settled, there seems nothing left to review." 500 U.S. at 367.

### Ineffectiveness Cubed

The appellant's contention is thrice-curst. In the first place, appellate counsel cannot be held to have been ineffective for failing to select for appeal this particular contention when he had far sharper and more persuasive contentions in his appellate quiver. In the second place, appellate counsel cannot be held to have been ineffective for failing to raise

on appeal a contention that suffered the twin procedural infirmities of being unpreserved and of having been waived. In the third place, appellate counsel cannot be held to have been ineffective for failing to raise on appeal a contention that was devoid of any substantive merit. In the last analysis, what was woefully ineffective in this case was not appellate counsel for failing to raise the contention but the contention itself that counsel wisely refrained from raising.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**